All right, our last two cases today are 23-13352 and 24-10191 in Re Chiquita Brands. So Mr. Hertz, we'll start with you. Good morning, Your Honors, and may it please the Court, I'm Richard Herz for the appellants. Plaintiffs' loved ones were brutally murdered by the AUC, a Colombian paramilitary terror organization that was working hand-in-glove with the Colombian military on a joint campaign to commit a widespread campaign of murder at the Army's behest. The District Court erred in holding that these killings were not committed under color of law. The Colombian Army wanted to fight an ongoing insurgency by murdering civilians that it thought were guerrilla sympathizers, and it wanted to terrorize the local population so that the local population didn't support the guerrillas. But it wanted plausible deniability. It didn't want blood on its own hands. So it trained, armed, and conspired with the AUC to commit those killings for the Army. Now, the District Court required plaintiffs to allege that a state official was specifically involved and directly involved in each killing. That was an error of law. The Supreme Court has held that no one fact can function as a necessary condition across the board for finding state action. That was Brentwood Academy. And instead, state action can be shown in a variety of different ways under a variety of tests that do not require direct participation. Tell me, and I know this is not something that's required generally, but are you arguing that there is color of law slash state action under one of the buckets that the Supreme Court has identified, or an amalgam of all of them together, or a couple of Which one do you think fits your complaint best? I think we have all of the interdependence of a symbiotic relationship. We have the agreement of a conspiracy. We have a public function that was delegated to the AUC of combating an insurgency. We meet any test, a number of tests, that the courts have accepted in any number of cases, including Charles. This court laid out a number of different cases, a number of different tests. We have a number of cases on state action and color of foreign law. So we have Aldana, Romero, Sinatral. Tell me how all of those fit into your theory of state action here. So I would say two things. One, this court has repeatedly held in Sinitrinal and Drummond, probably most recently, that the TVPA looks to section 1983 case law. Including in Drummond, the court said that it does that to provide the broadest coverage possible. So I think all the tests that are available under 1983 are available under the TVPA. And I think in Romero, the court specifically said that the plaintiff could show either that there was direct involvement or that there was a symbiotic relationship that involved the abuses. I think we meet that test here. So again, I think we can do this through any number of this court's and the Supreme Court's tests. I know you have a long section in the complaint on color of law state action, but tell me what you think the critical, factual allegations are that demonstrate that the district court made a mistake. So I think there's two sets. One is the relationship between the AUC and the military, and the other is the connection between that relationship and the abuses. So if I can take the first, the military trained and armed the AUC. It gave the AUC lists of people to execute, and a Colombian tribunal found that information supplied by the military resulted in innumerable deaths. A Colombian court found a conspiracy between the 17th brigade, which was the local brigade in Uruba, and the AUC. The AUC and the military went on joint patrols, including massacres, so that they acted together. We have pages of allegations that this was a joint enterprise between the AUC and the state. On the connection, Your Honor, between this and the abuses, so we have sort of two buckets. One bucket is specific allegations about specific victims. Another is more general allegations, and I want to emphasize that we're on a motion to dismiss here. So all we have to do is present allegations that make it plausible that this joint enterprise included these abuses, and we easily do that here. So four, to take the specific allegations first, four victims, there was direct military involvement. The district court improperly discounted those. Can you tell me who the four victims were? The four victims were John Doe's 64, 322, and 104, and 301, and that's, you know, described in our complaint in the record at 1219 and 1185. For 45 of the victims, they were specifically targeted as members of community groups or political organizations that the government and the AUC were targeting because they thought they were sympathetic to the guerrillas, or some of those were otherwise targeted because they thought they were sympathetic to the guerrillas. Do you agree that you have to prove the state action color of law element as to each decedent? For joint action, we have to show some connection. We do not have to show that the military was directly involved in any particular killing or, you know, that it particularly solicited any particular killing. It's enough to show that the military solicited a campaign of murders that was directed to terrorize the population so that the population did not support the guerrillas. Okay, so let me give you a hypothetical down the road. Let's say you get to trial on a given decedent. Yes, your honor. And the evidence at trial in this hypothetical is that members of the AUC killed the decedent because of a personal vendetta. Yeah. Do you lose? We probably lose that claim, but we don't have to do. I mean, this is a motion to dismiss. We're talking about a complaint. I know, I know. That's why I said, do you have to prove? This is not my question. My initial question to you was not based on the plausibility standard. Yes. But I need to know what the ultimate legal proof element is. And my question is, do you have to prove, not allege, do you have to prove it to prevail at the end of the day that a given killing of a decedent was done under color of law? Yeah, and I think we would do that by showing it's part of the pattern. If they came forward with evidence that said this was a personal dispute and the jury believed that, I think we would lose that claim. But we don't have to go through every claim and prove this is not a personal dispute. We just have to provide evidence. I'm not trying to challenge you on what methods of proof you could use and what circumstantial evidence would establish that, but you agree that at some level you have to show or convince a jury that the killing of a decedent was based under color of law or under state foreign law. For these TVPA claims, yes. Correct. Okay. And I would say so, you know, as I was saying about the individuals, we have 55 individuals for whom there was either direct involvement by the military or these were precisely the types of people that the AUC and state officials agreed to kill. More generally, all of the killings here fall within the pattern of the, fall within the common plan. The civilian population of Ordovo was seen to support the guerrillas. The AUC state conspiracy was to terrorize the civilian population to deter support for the guerrillas. Let me ask you something for a minute. You were talking about the different John Doe's, and I want to ask you about John Doe 301. So you told us about John Doe 64, 322, 104, and 301. And so I just want to make certain I understand your argument correctly. Are you saying that his killing was related to the threats he received days before his death? Tell me how you come up with that inference from the factual allegations of your complaint. So yes, we are saying that. The military was specifically providing lists of people to kill. The military was involved on the ground, not necessarily directly in every single killing, but in many killings. And so when you have a situation where the military is picking targets and they threaten somebody, and then a couple of days later, he's murdered by the AUC, who we have pages of evidence or pages of allegations was in a conspiracy with the military, I think it's reasonable to infer, you know, on a motion to dismiss that those things are connected. Thank you. All right. You've saved your time for rebuttal. Thank you very much. Good morning, your honors. May it please the court. Melissa Fundora Murphy on behalf of the for decades, which is that state action requires an act-specific link. Congress carefully crafted the TVPA to impose liability on a narrow class of defendants who are state actors or who truly act with state authority. That critical constraint deserves close scrutiny when a U.S. court is asked to permit claims that accuse a foreign government of murdering and torturing its own civilians. And especially where, as here, plaintiffs seek to expose six Americans to personal liability for alleged misconduct by foreign private actors and a foreign government. Judgment should be affirmed here for three reasons. First, the governing TVPA state action rule decides this case. This court has analyzed the state action issue under the TVPA in the same context of the Colombian Civil War in Romero and Sinaltrinal and has articulated the case that applies in this context. There must be a symbiotic relationship that ties to the specific instances of murder and torture alleged in the complaint. Why does there have to be a symbiotic relationship? Why can't you try to fit in under one of the other state action buckets? I believe that the court surveyed the entire 1983 jurisprudence and determined that the symbiotic relationship test is the one that makes sense under the TVPA, and that is a logical conclusion. But none of those cases say that that's the exclusive method. They use and analyze that method, but they don't say that's the only one you can use under the TVPA. So if we're borrowing 1983 principles for TVPA purposes, why should we knock out the other buckets? Sure, Your Honor, and it's a fair question, and you're right that those cases don't expressly exclude the other tests. However, other tests were presented to the court in that case in the briefing by the parties. The court also read Brentwood and other cases that discuss the various different tests, and even setting that aside, this court has articulated the state action tests in the 1983 context dozens of times, maybe hundreds of times, and did not articulate those 1983 tests in the TVPA context. And the reason that that makes sense is because these other two tests, the state compulsion test and the public function test, really don't fit in the context of torture and extrajudicial killing. That's specifically meant to target and hold liable individual state actors. The test that makes sense is that symbiotic joint action test, and that's because the state function test doesn't encompass a corrupt state function. And Congress assumed the same thing. So in the legislative history, Congress discussed whether the TVPA claims might be precluded by the state act, the act of state doctrine, because U.S. courts typically don't pass on the official public acts of a foreign sovereign. And the court concluded that it would not because torture and or non-official public acts. The TVPA is meant to target individuals who conduct torture and murder, and that fits in with the joint action test. However, even if this court wanted to import these other tests, the plaintiffs don't meet those tests here. So under the state compulsion test, which has very rarely ever been found to be met, I don't think there is a Supreme Court case that actually finds it met. It wasn't met in Blum or Jackson or American Manufacturers or Flagbrothers or any of those other cases. It applies where a state compels the specific challenge decision, where it requires that decision. And here we don't have any factual allegations that would meet that test. The public function test, the same thing. Plaintiffs try to recast their allegations as counterinsurgency function or police function, but the Supreme Court hasn't even acknowledged that as a traditional and exclusive public function of the U.S. government, let alone should a U.S. court conclude that for a foreign government. So that test really doesn't apply. Why not if the whole purpose of the TVPA is to allow certain claims for torture and extrajudicial killings? That's the whole subject of the statute. That is the subject of the statute and it is not meant to police conduct broadly, but rather individual instances of torture and killing. And this court has always held, even in the 1983 context, that there has to be a close nexus between the state and each challenged act. It's no different under the TVPA. We have to be able to closely tie the foreign state to each individual act. So here there were 251 deaths pled. The district court analyzed those deaths and found that plaintiff's theory was premised upon broad collaboration and support, the same as was found in Sinaltrinal and Romero, and dismissed with specific instructions that they could replete an attempt to link the state to each individual act. When plaintiffs repled their complaint, they only attempted to do that with a subset of 55 cases. Those 55 cases still don't meet the state action standard for a number of reasons. So for the vast majority of those cases, which is 45 cases, they're premised on a conspiracy theory. This court, all of your honors, have ruled in conspiracy 1983 cases many times. And the court has very clearly required particularized material facts that there was an agreement to violate the specific plaintiff's constitutional rights, to put it in 1983 terms. Here, there are not particularized material facts that there was an agreement to kill these specific individuals. So if I could just address a couple points that my friends on the other side made. They talked about— Well, here, let me—this is paragraph 308 in the complaint. As documented by the Inter-American Court of Human Rights in a 2006 judgment, with the tolerance and collaboration of law enforcement officials from Las Tangas, Fidel Castaño perpetrated the massacres at Curdao, 15 people murdered, Buenavista, Cordoba, 28 people assassinated, Puente Coquitos, Turbo, 26 people murdered, Canalete, Cordoba, 16 victims, Pueblo 43 peasants disappeared and murdered. If it says that law enforcement officials tolerated and collaborated in those killings by the AUC, why is that not enough as to those individuals? Sure, your honor. None of the individuals pled in this complaint are alleged to have been killed in any of those massacres. So that is the missing link here. What plaintiffs plead is, I think it was 10 different massacres. They spend pages and pages on these massacres. None of these plaintiffs were killed in those massacres. They discuss joint patrols. None of these plaintiffs are alleged to be killed in those joint patrols. They spend much of their allegations discussing the 17th Brigade and specifically General Del Rio, who they acknowledge was ultimately prosecuted and convicted by the Colombian government. He conducted Operation Genesis and they extensively quote the court decision with respect to General Del Rio. General Del Rio was a commander for a mere two years, 1995 to 1997. And again, none of these plaintiffs in the complaint are tied to anything that General Del Rio did. They're not tied to Operation Genesis. They're not tied to any of these joint operations. So that's really what it comes down to is that, yes, are there documented instances where the Colombian courts have found state actors responsible for specific deaths? There are, but they have not found that with respect to these plaintiffs. And these deaths have been investigated for 25 years or even more. This is what the plaintiffs have been able to plead after all that time, multiple opportunities to amend. And this is not a situation where there is an information asymmetry, where there's information in the possession of the defendants that the plaintiffs, you know, would only have access to in discovery. This is public information. These are investigations that have been ongoing for so long, and yet plaintiffs cannot identify state involvement in each one of these deaths. So you're, I don't want to put words in your mouth, but you're arguing, so you concede that there was a symbiotic relationship between the AUC and the Colombian military generally? There are instances of collaboration. They identify, as I said, General Del Rio's certain joint operations, certain massacres, but not tied to the deaths in this case. And that's really what this comes down to and what the court is always required, even in the 1983 context. So your argument, as I hear you, is that they failed on this nexus requirement of showing state action, color of foreign law, with regard to each specific decedent that they're suing on behalf of? Correct, Your Honor. They don't allege that nexus, and that is what's required. There has to be government involvement in the torture and killing. That's clear from the 1983 jurisprudence. It's also clear from the legislative history, which we cite in our briefing, that section that says that a plaintiff has to have government involvement in the torture or killing to state a claim. I'll also note that this idea that they can meet the state action test with a pattern of practice, I would point the court to its Mamani decision, where the court said that plaintiff's evidence about widespread casualties and a pattern of innocent deaths does not suffice to demonstrate that in any particular instance, a death was an extrajudicial killing, which is another requirement under the TVPA. That same principle applies with the same force and effect, perhaps even greater import, with respect to the state action issue. A pattern is not going to be sufficient in any one case. But if you have that case, if that case had, if you have expert testimony with regards to the pattern, you might be able to get over the line. So the pattern in of itself may not be enough, but you can supplement it with other evidence like expert testimony. I don't think that that's the case with respect to state action. What this court is always required, for instance, in the conspiracy context is material facts that there was an agreement to violate the plaintiff's specific rights. That is what's missing here. And so what the plaintiffs essentially are doing are trying to string together discrete events rather than showing particularized government involvement in the deaths that are at issue here. Are you saying that also for the Category 2 allegations, the John Doe 64, 322, and 104? Plus, I think he also said 301. Happy to address those, Judge Covington. So there are four cases that the plaintiffs claim are their strongest cases of direct involvement. None of those cases identify a state actor that actually was directly involved in any of those cases. It's unidentified individuals. That's never been sufficient. In Mamani, there were Bolivian soldiers generally that committed the killings, but the defendants in that case were state actors. That this court required the district court to make sure that those defendant state actors could be linked to each death. So this doesn't approach, none of these four cases approach that level of direct involvement that was found sufficient in Mamani or in Aldana. Aldana is a very instructive case as well because it was a motion to dismiss, and the court rejected allegations of general collaboration, toleration, and only allowed the claim to proceed where the plaintiffs were able to identify a specific state actor that was affirmatively involved in the death at issue. That's what the court was talking about when it said that direct involvement could be sufficient. That's not what we have in any of these four cases, and I'm happy to address them specifically, Your Honor, if you'd like. We could talk about John Doe 301. Well, for instance, I mean, he does say, or they do say in the complaint, paramilitaries forcibly removed John Doe 322 from his home while wearing Colombian military uniforms and carrying Colombian military weapons. Tell me why that's not sufficient. Because uniforms and weapons alone don't mean state action. The key allegation, which is that these were actually military soldiers moonlighting as paramilitaries, that's pled on information and belief, and they don't have the material facts to support that. And they're not going to get those material facts, as we know, because this is what they've been able to plead after many decades of investigation. But this is plausibility. This is not proof, and this is not heightened pleading either. So you're not in a rule nine scenario where you have to show the, you have to allege the who, when, where, why, how. This is notice pleading. That is true, Your Honor. Isn't it a fair inference that if the paramilitaries are wearing Colombian military uniforms, they got them from the Colombian military? That's, that, I don't think that that's necessarily a fair inference. For instance... Why not? Well, for instance, we can take a... Where did they, where did they buy them? Like a five and ten cent store? Well, we're talking about warring groups of, you know, warring armed factions that were wearing camouflage and fatigues in the jungles of Colombia. So it's possible that that they sourced them elsewhere, but... But that doesn't mean that the plaintiff's allegation is implausible. It's not... Plausibility, the Supreme Court has told us, and plausibility is a difficult standard because it can mean so many things, but the court has been clear that it doesn't mean probability. I agree with you, Your Honor. So if it's plausible, it's something less than probable, but somewhat substantial. And so why isn't it plausible that these paramilitaries who killed this decedent were acting with and on behalf of and in collaboration with the Colombian military? Because, again, that key allegation is pled on information and belief. I think also they plead in paragraph 15... But information and belief is not a death knell for an allegation. It is not if there are material facts to support that. In paragraph 15... The fact, the allegation is that they were wearing Colombian military uniforms and carrying Colombian military weapons. That's not on information and belief. That is true, Your Honor, but... And that they dressed in military uniforms, took him to the farm where he worked, and murdered him and accused him of being a guerrilla collaborator of and storing weapons in his home. And that they killed him under color of law because the Colombian military collaborated and coordinated with the AUC in his murder and conspired to eliminate suspected guerrilla sympathizers. That's not on information and belief. But that is a conclusory allegation that they conspired together. And it actually is on... In paragraph 1534, they do plead that as well on information and belief. But there has to be... It can't... The plaintiff can't just plead a conspiracy or just allege that there's a conspiracy without material facts that actually establish that the conspiracy existed. So, for instance, the wearing of uniforms, one could think of current events like the assassination of the House Speaker in Minnesota. The person who carried out that killing was wearing a police uniform, had a badge, had a patrol vehicle with sirens on it. That doesn't make that killing a color of law killing. It doesn't mean that the police is actually... Well, as a factual matter, you're absolutely right, because the evidence shows that he was acting alone. But it doesn't mean that an allegation that... If there have been allegations that he was wearing the uniform of Minnesota police or Minnesota state troopers and that he was carrying their weapons, that wouldn't get you over the threshold? Well, the plaintiffs also plead at Appendix 1168, paragraph 249, that the AUC was deeply involved in the drug trade that gave them steady source of income to procure arms. So they had other ways of getting arms as well. But the... Sure. That just means that as a factual matter, you might be able to prevail at summary judgment and show that the allegations are not founded. But this is plausibility. This is not proof. This is not convincing a jury by a preponderance of the evidence or even proving to a district judge that there are material issues of fact. I'm just sure that... I'm not sure that your nexus argument sweeps as to all of these decedents. That's only my personal view. Sure, Your Honor. But I think with respect to this death, if we think about it in the context of the 1983 conspiracy cases that all of your honors have presided over, where at the motion to dismiss stage in a pleading, the court requires material facts that an agreement actually existed. And that's what's missing here. It's just an inference here. There's just circumstantial evidence. But you've agreed earlier that there was a symbiotic relationship between the Colombian military and the AUC. And you said what was lacking was the nexus for specific killings. So once you admit that there's a symbiotic relationship based on all these allegations between the Colombian military and the AUC, that's a fact you've got to take into account too in determining nexus. Well, what I said was that there were... they pledged specific instances of collaboration between specific military members and the AUC in carrying out certain joint operations and massacres. Not that there is a sufficient symbiotic relationship wholesale that could apply to any death. There's not enough facts here to attribute the 100,000 deaths that the AUC committed all to the Colombian state without being able to actually tie a nexus to each specific death. And this court has held that. So circumstantial evidence can support a 1983 conspiracy inference, but the complaint still has to make particularized allegations that a conspiracy existed. That was Givi Comcast, which I believe Your Honor, Judge Lagoa was on that panel. So circumstantial evidence alone is not going to get you there unless there is material facts that a state actor and a private actor entered into an agreement to deprive that plaintiff of their rights. And there's not enough allegations here, factual allegations, with respect to any of these four deaths that get them over that hurdle. So again, this comes down to a broad conspiracy or a broad collaboration or support or toleration, which was rejected in cases like Sanaltronal and Romero. So again, this court's jurisprudence is very helpful because you have cases like Romero and Sanaltronal that are a broad conspiracy to target union workers and support. And in Sanaltronal, arming and providing ammunition and allowing them to pass on roads, all of that was pled in Sanaltronal with very similar third-party source material that they cite here. And that wasn't sufficient. Actually, in Sanaltronal, they also allege that military members moonlighted as paramilitaries, that they were in each other's ranks. That alone is not sufficient unless you can actually tie with material facts state action to a particular death. So you have Romero and Sanaltronal sort of on one end of the spectrum. Then you have cases like Aldana and Momani, where this court allowed those claims to proceed because there was particularized facts that showed state involvement in those particular killings. And the court was very clear that that was required. To Your Honor's point earlier, we've taken you way over your time. We've taken you over, so it's not a problem. I'll give you 30 seconds to wrap up. Thank you, Your Honor. So in sum, we believe that affirmance is appropriate for three reasons. One, again, this court's jurisprudence is quite clear, and it's binding on this court. And we believe that it mandates dismissal and that the district court's opinion was correct. The second reason is that even if the court were to import these other Section 1983 tests, they're very difficult to meet. Very rare circumstances are they ever met, and the plaintiffs do not meet either one of those tests here. And lastly, we presented an alternative ground for affirmance, which was that these six individuals are not sufficiently tied to each one of these deaths to hold them liable under the TDPA, which again is a very specific and targeted statute. So with that, Your Honor, what we ask for today is a narrow affirmance in line with Pinaltronal and Romero that preserves accountability for truly state-directed abuses like those in Altana and Mamani, while not embroiling the U.S. courts, turning them into commissions on foreign civil wars broadly and generally, which was not the purpose of the TDPA. All right. Thank you very much. Thank you. Valerie, can you give them a couple of extra minutes, please? Thank you, Your Honor. Go ahead. So if I've heard my colleague correctly, their argument depends on two claims, both of which are erroneous. The first is that the only test this court should is the joint action or symbiotic relationship test. And as I said earlier, this court has repeatedly held that the TDPA looks to 1983 law. The second is that the joint action or symbiotic relationship test requires direct participation in each killing. And in fact, in Charles, the court listed a number of different sort of iterations or formulations of the joint action test, and none of them require direct participation. So for example, conspiracy, which is— But I thought you agreed that at the end of the day, you had to show that a particular killing was done under color of foreign law. Yes, but we don't have to show that through direct participation. We have to show that through, in the words, the way Romero put it, is that the state-AUC relationship involves the killing. And here, putting aside the 55 who were specific targets, the point of the relationship here was to terrorize the local population so that the local population would not support the guerrillas. Every killing that the AUC did was pursuant to that conspiracy because every killing that the AUC did in Urba was sent the message that if you help the guerrillas in any way or are sympathetic to the guerrillas, you will be killed. And basically, what their argument is, is that you cannot have a conspiracy or a joint venture to kill people wholesale, that it has to be retail, and that the implications of that are staggering. Like, for example, the example we put in our brief is that if a local sheriff sat down with the Klan and agreed that the Klan could go out and intimidate African Americans in the community and gave them the weapons to do that, but if it didn't send deputies to each instance, or if it didn't say, single out that guy and not that guy, that there would be no state action. And, you know, the 1983 was specifically designed to prevent that. You know, conspiracy law specifically says, if you look at, say, Halberstam, which is sort of the lead civil conspiracy case, that was a case where the defendant was held liable for a conspiracy to commit burglaries. The defendant didn't go on the burglaries. The defendant was just the bookkeeper. The defendant didn't know who was going to be robbed. And, in fact, the defendant was held liable for a murder that was committed during the burglaries. He wasn't held liable for a burglary. The point is that we don't have to show under conspiracy, which is probably the hardest way to prove state action, that the state wanted particular people to be killed or that it was there in every killing. We just have to show that there was a conspiracy to commit a pattern of abuses and that that this, that each killing was part of the pattern. And on a motion to dismiss, when the whole purpose of this conspiracy was to intimidate the local population, it's reasonable to infer that these killings furthered that conspiracy. You know, this court held in, recently in camps, that the whole purpose of the TVPA was to, just looking for the quote, is the TVPA is, quote, designed to ensure that the most egregious cases of human rights violations do not go unheard. Defendant's theory immunizes the most egregious cases. It immunizes the cases where court, where state actors outsource mass atrocity. And it, and it ignores the reality of exactly how, you know, states commit abuses. The whole point of 1983 is to, to approach these things in a flexible way. And the point of the TVPA is to provide redress when states commit abuses. These are the most egregious types of abuses. You don't see many cases that look like this. You don't see many cases with this kind of connection between the state and the private actor. And you don't see many cases where what the state is doing is partnering with an otherwise private entity to commit a widespread campaign of terror. And so, you know, it can't be that when state officials act together with private parties to murder one perceived opponent, there's state action. But when state officials act together with a private party to slaughter their perceived opponents en masse, that there isn't state action. That's just entirely at odds with the entire purpose of the TVPA. And it's entirely at odds with the history of 1983 and the flexibility that 1983 law provides in assessing the reality of a state, of state action. And, you know, Colombian courts have found over and over again that the AUC and the state were inextricably intertwined. They've held states, they've held states and state the state and state actors responsible for killings. And all we're saying is that this court should not deny the reality that the Colombian courts have already found in assessing their own history. And for that reason, Your Honor, if there's no further questions, we urge that the district court's decision be overturned. All right. Thank you both very much. We're in recess.